*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————————

## UNITED STATES
Appellee/Cross-Appellant

**v.**

### Steven A. BEGANI, Chief Petty Officer
United States Navy (Retired), Appellant/Cross-Appellee

**Nos. 20-0217 & 20-0327**

Crim. App. No. 201800082

Argued March 9, 2021—June 24, 2021

Military Judge: Stephen C. Reyes

For Appellant/Cross-Appellee: *Stephen I. Vladeck,* Esq. (argued); *Lieutenant Clifton E. Morgan III*, JAGC, USN, and *Lieutenant Daniel E. Rosinski*, JAGC, USN (on brief).

For Appellee/Cross-Appellant: *Major Clayton L. Wiggins,* USMC (argued); *Lieutenant Colonel Nicholas L. Gannon,* USMC, *Lieutenant Joshua C. Fiveson,* JAGC, USN, and *Brian K. Keller,* Esq. (on brief).

Amicus Curiae for Appellee/Cross-Appellant: *Peter Coote*, Esq. (on brief) (on behalf of Protect Our Defenders).

Chief Judge STUCKY delivered the opinion of the Court, in which Judge OHLSON, Judge MAGGS, Judge HARDY, and Senior Judge CRAWFORD, joined. Judge MAGGS filed a separate concurring opinion, in which Judge HARDY and Senior Judge CRAWFORD joined.

———————————

Chief Judge STUCKY delivered the opinion of the Court.

We originally granted review to consider whether subjecting members of the Navy's Fleet Reserve, but not members of the Retired Reserve, to Uniform Code of Military Justice (UCMJ) jurisdiction violates the equal protection component of the Fifth Amendment. U.S. Const. amend. V. The Judge Advocate General of the Navy timely certified an additional issue for review: whether Appellant/Cross-Appellee (Appellant) waived this claim. After the United States District Court for the District of Columbia held that the exercise of court-martial jurisdiction over members of the Fleet Reserve was unconstitutional, *Larrabee v. Braithwaite*, 502 F. Supp. 3d 322 (D.D.C. 2020), we granted review of an additional issue:

whether members of the Fleet Reserve have sufficient current connection to the military for Congress to subject them to continuous UCMJ jurisdiction. We hold: (1) that Appellant did not waive appeal of his assigned issue; (2) as a member of the land and naval forces, Appellant was subject to court-martial jurisdiction; and (3) that the exercise of jurisdiction over Appellant did not violate equal protection.

## I. Background

The United States Navy-Marine Corps Court of Criminal Appeals (CCA) summarized the relevant background as follows:

> After 24 years of active-duty service, and numerous voluntary reenlistments, Appellant elected to transfer to the Fleet Reserve. He was honorably discharged from active duty and started a new phase of his association with the "land and naval Forces" of our Nation. In short, for all intents and purposes, he retired. In addition to receiving "retainer pay," base access, and other privileges accorded to his status as a member of the Fleet Reserve, he remained subject to the UCMJ under Article 2(a)(6).

> After Appellant retired, he remained near his final duty station, Marine Corps Air Station (MCAS) Iwakuni, Japan, and worked as a government contractor. Within a month, he exchanged sexually-charged messages over the internet with someone he believed to be a 15-year-old girl named "Mandy," but who was actually an undercover Naval Criminal Investigative Service (NCIS) special agent. When he arrived at a residence onboard MCAS Iwakuni, instead of meeting with "Mandy" for sexual activities, NCIS special agents apprehended him.

> The Commander, U.S. Naval Forces Japan, sought approval from the Secretary of the Navy to prosecute Appellant at a court-martial, as opposed to seeking prosecution in U.S. District Court under the Military Extraterritorial Jurisdiction Act (MEJA). Because Appellant was still subject to the UCMJ, and therefore ineligible for prosecution under MEJA, the Secretary authorized the Commander to prosecute him at court-martial.

> After Appellant unconditionally waived his right to a preliminary hearing under Article 32, UCMJ, he entered into a pretrial agreement (PTA). In his PTA,

he waived his right to trial by members and agreed to plead guilty and be sentenced by a military judge. He also waived all waivable motions except for one. He argued he could not lawfully receive a punitive discharge because he was a member of the Fleet Reserve. The trial court denied that motion.

*United States v. Begani*, 79 M.J. 767, 770 (N-M. Ct. Crim. App. 2020) (footnotes omitted).

The CCA affirmed the findings and sentence, holding that Appellant "[was] a member of the land and naval Forces"; "Congress [had] the authority to make him subject to the UCMJ under its constitutional power to regulate those Forces"; and subjecting members of the Fleet Reserve to trial by court-martial, but not retired reservists, did not violate equal protection. *Id.* at 775, 781, 783.

## II. Waiver

Recognizing that subject matter jurisdiction cannot be waived, the Government argues that Appellant's equal protection claim only "incidentally" relates to jurisdiction, and therefore can be, and was, waived by Appellant's guilty plea. Whether Appellant waived the issue is a question of law that we review de novo. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

Appellant entered into a pretrial agreement to plead guilty, in which he waived all waivable motions, with the exception of his claim that a punitive discharge is not an authorized punishment for a retiree. Rule for Courts-Martial (R.C.M.) 705(c)(1)(B) prohibits a term of a pretrial agreement that deprives an accused of "the right to challenge the jurisdiction of the court-martial." The court-martial had jurisdiction over Appellant through Article 2(a)(6), 10 U.S.C. § 802(a)(6) (2018)—which Appellant now alleges violates equal protection. If Appellant prevails, and Article 2(a)(6) is unconstitutional, the court-martial has no jurisdiction to try *him*. He would therefore have successfully "challenge[d] the jurisdiction of the court-martial," which cannot be waived. R.C.M 705(c)(1)(B). Therefore, this Court finds that Appellant's argument that Article 2(a)(6) violates the equal protection component of the Fifth Amendment has not been waived.

**III. Court-Martial Jurisdiction over the Fleet Reserve**

In Appellant's second assigned issue, which we examine first, he argues that court-martial jurisdiction over members of the Fleet Reserve, and retired members of the armed forces more generally, is unconstitutional. Though the Constitution gives Congress the power to set rules for the "land and naval Forces," U.S. Const. art. I, § 8, cl. 14, Appellant argues that members of the Fleet Reserve are not currently part of the "land and naval Forces" and so cannot be subject to the UCMJ.

A. Standard of Review

The question of jurisdiction is a question of law that we review de novo. *United States v. Hennis,* 79 M.J. 370, 374–75 (C.A.A.F. 2020).

B. Law

Congress has plenary authority to "raise and support Armies" and to "provide and maintain a Navy." U.S. Const. art. I, § 8, cls. 12–13. Congress also has plenary authority to "make Rules for the Government and Regulation of the land and naval Forces." *Id.* at cl. 14. This power is vast, permitting even compulsory service. *See Selective Draft Law Cases*, 245 U.S. 366 (1918). The " 'land and naval Forces' " consist of those "persons who are members of the armed services." *Reid v. Covert*, 354 U.S. 1, 19–20 (1957).

Pursuant to this governing authority over the land and naval forces, "Congress has empowered courts-martial to try servicemen for the crimes proscribed by the U.C.M.J." *Solorio v. United States*, 483 U.S. 435, 438–39 (1987). An offense need not be military in nature to be tried by court-martial. *Id.* The only question is the "military status of the accused. . . . namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.' " *Id.* at 439 (internal quotation marks omitted) (citations omitted).

As part of maintaining a Navy, Congress created multiple categories into which naval personnel fall, one being the Fleet Reserve. 10 U.S.C. § 6330(a) (2012). The Fleet Reserve is composed of "enlisted member[s] of the Regular Navy . . . who ha[ve] completed 20 or more years of active service in the

armed forces." 10 U.S.C. § 6330(b) (2012). Transfer to the Fleet Reserve is optional, and members of the Fleet Reserve are entitled to retainer pay, remain subject to recall at any time, and are subject to the UCMJ. *See* Article 2(a)(6), UCMJ; 10 U.S.C. § 688(a). Upon completion of thirty years total service, active and inactive, a member of the Fleet Reserve is retired, and is thereafter entitled to retired pay. 10 U.S.C. § 6331(c).

For well over a hundred years, Congress, the military, and the Supreme Court have all understood that retired members of all branches of service of the armed forces who continue to receive pay are still a part "of the land and naval Forces" and subject to the UCMJ or its predecessors. *See, e.g.*, *United States v. Tyler*, 105 U.S. 244, 246 (1882) ("It is impossible to hold that [retirees] who are by statute declared to be a part of the army, who may wear its uniform, whose names shall be borne upon its register, who may be assigned by their superior officers to specified duties by detail as other officers are, . . . are still not in the military service."); *McCarty v. McCarty*, 453 U.S. 210, 221–22 (1981) (acknowledging that "[t]he retired officer . . . continues to be subject to the [UCMJ]"). Though retirees are still part of the armed forces, persons who have completely separated from the military are not. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 14–15 (1955) (holding that "civilian ex-soldiers who had severed all relationship with the military and its institutions" could not properly be subject to court-martial for crimes committed while in the Army). Neither are civilian dependents of servicemembers, *see Reid*, 354 U.S. at 19–20, or civilian employees. *See McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281 (1960); *Grisham v. Hagan*, 361 U.S. 278 (1960). "The test for jurisdiction . . . *is one of status*, namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces.' " *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 240–41 (1960) (emphasis added).[1]

---

[1] *But see* John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 552, 120 Stat. 2083 (2006); *United States v. Ali*, 71 M.J. 256, 259 (2012) (holding that Article (2)(a)(10), subjecting to court-martial nonmilitary persons

C. Discussion

Appellant agrees that under our current case law, members of the Fleet Reserve are in the land and naval forces and subject to the UCMJ. He argues that those cases were either wrong, or their reasoning has been vitiated by subsequent Supreme Court case law and the paucity of examples of involuntary retired recall. Appellant therefore urges this Court to supplement the "military status" test with a "significant connection" test.

This would not be the first time courts have tried to analyze sufficient "connections" to the military to determine UCMJ jurisdiction. In *O'Callahan v. Parker*, the Supreme Court sharply departed from earlier precedent and held that a servicemember could only be court-martialed for crimes that had a sufficient connection to the military. 395 U.S. 258, 274 (1969). After nearly two decades of attempting to parse what level of "service connection" was sufficient—resulting in a myriad of categorical exceptions and twelve different factors to analyze—the Supreme Court reversed *O'Callahan* in *Solorio* and held that the only appropriate test is the "military status of the accused." 483 U.S. at 436, 439.

Acknowledging that precedent and practice are not on his side, Appellant nevertheless urges this Court to hold that the Supreme Court narrowly construes military jurisdiction, requiring it to be justified by "certain overriding demands of discipline and duty," *id.* at 440 (internal quotation marks omitted) (citation omitted), and be "the least possible power adequate to the end proposed." *Toth,* 350 U.S. at 23 (internal quotation marks omitted) (citation omitted).

We think this is misplaced. First, *Solorio*'s discussion of the " 'demands of discipline and duty' " "concern[ed] the scope of court-martial jurisdiction over *offenses committed by servicemen*" and not who is subject to the UCMJ. 483 U.S. at 440 (emphasis added) (citation omitted). *Solorio*'s test for *jurisdiction* was the military status of the accused. *Id.* at 451. Second, *Toth* limited the expanse of UCMJ jurisdiction over *civilians*, and was not concerned with whether an individual was a

---

accompanying armed forces in the field, does not violate the Constitution).

member of the armed forces. 350 U.S. at 22 (declining to infer that the Necessary and Proper Clause included the power to circumvent the Bill of Rights and subject ex-servicemen to court-martial "when they are actually civilians"). Neither of these cases addresses the question here, whether a member of the Fleet Reserve is part of the "land and naval Forces." Other cases, both from our predecessor Court and the Supreme Court, discuss this explicitly.

In prior cases upholding the military status of members of the Fleet Reserve, our predecessor Court identified multiple indicators that members of the Fleet Reserve retain military status. Appellant, as a current member of the Fleet Reserve, is not in the same situation as the appellant in *Toth*, as he has not "severed all relationship" with the military. Fleet Reservists are still paid, subject to recall, and required to maintain military readiness. Appellant argues that these ongoing connections are insufficient to place Appellant in the "land and naval Forces" because each, in isolation, is insufficient to confer military status.

*Pay.* Once an enlisted member of the Navy has served for twenty years, he can elect to transfer to the Fleet Reserve, and receive ongoing retainer pay, or he can simply leave the service and become a civilian. Appellant points out that merely receiving pay from the Department of Defense cannot, standing alone, confer UCMJ jurisdiction. *See, e.g.*, *Kinsella*, 361 U.S. at 249. But of course, members of the Fleet Reserve are not civilians, like the defendants in *Kinsella* and *Toth* were. Appellant argues that pay cannot place someone in the armed forces—which is of course true. But that is not what happened here. Being paid didn't confer military status—Appellant is paid *because of* his status. Members of the Fleet Reserve receive retainer pay because they are *currently* in the Fleet Reserve, which is a component of the United States Navy. They have not "severed all relationship" with the military; rather, they are *current* members of the armed forces, though not on active duty, and they are *currently* paid for maintaining that status.

Appellant asks us to find that the Supreme Court implicitly overruled its prior cases on this subject when it held that, under a federal tax statute, a state could not treat retired military pay differently from retired pay for state officials.

*Barker v. Kansas*, 503 U.S. 594, 605 (1992) (holding that "[f]or purposes of 4 U.S.C. § 111, military retirement benefits are to be considered deferred pay for past services"). Of course, in that same case, the Court also said, "[m]ilitary retirees unquestionably remain in the service and are subject to restrictions and recall." *Id.* at 599. Appellant dismisses this as dicta, but though UCMJ jurisdiction was not in question in *Barker*, it would be strange indeed to find that the Supreme Court implicitly held what it explicitly disclaimed. The state income tax consequences for retainer pay have no bearing on a retired person's continuing status as a member of the federal armed forces.

*Military Readiness and Recall.* Members of the Fleet Reserve are not only paid for their current status; their status also requires that they maintain readiness for future recall. *See* Naval Military Personnel Manual (MILPERSMAN), Article 1830-040, CH-38, at 12 (Dec. 19, 2011). They are subject to recall by the Secretary of the Navy "at any time." 10 U.S.C. § 688(a). They are also required to "[m]aintain readiness for active service in the event of war or national emergency," to keep Navy leadership apprised of their home address and "any changes in health that might prevent service in time of war," and remain "subject at all times to laws, regulations, and orders governing [the] Armed Forces." MILPERSMAN Article 1830-040, CH-38, at 12; 10 U.S.C. § 8333. Members of the Fleet Reserve are required to inform their branch of travel or residency outside the United States for any period longer than thirty days, and can be required to perform two months of active service every four years. MILPERSMAN Article 1830-040, CH-38, at 12. If a member of the Fleet Reserve becomes unfit for any duty, he will be transferred to the Retired lists of either the Regular Navy or the Retired Reserve. 10 U.S.C. § 6331(a); MILPERSMAN, Article 1830-030, CH-13, at 3 (Dec. 7, 2005).

Appellant argues that recall is rare, he has no "ongoing military responsibilities," and there is no "good order and discipline" benefit to being subject to the UCMJ while not on active duty. That Congress could require *more* is not an argument that it has not required enough. Congress has the responsibility "for the delicate task of balancing the rights of servicemen against the needs of the military." *Solorio*, 483

U.S. at 447. Congress has determined that, in order to run an all-volunteer military and maintain an adequate supply of qualified retirees to supplement that force, it needs members of the Fleet Reserve to be subject to the UCMJ but not to take other steps it requires of regular members of active-duty components. And as a factual matter, although the recall of retirees may not be a frequent event, it is not the rare occurrence that Appellant suggests. As the lower court noted when previously considering this very issue, "in both of our wars with Iraq, retired personnel of all services were actually recalled." *United States v. Dinger*, 76 M.J. 552, 557 (N-M. Ct. Crim. App. 2017) (alteration in original removed) (internal quotation marks omitted) (quoting Francis A. Gilligan & Fredric I. Lederer, *Court-Martial Procedure* § 2-20.00, 24 (4th ed. 2015)), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018).

Congress has explicit and extremely broad powers over the military under Article I of the Constitution and there is no constitutional requirement that all members of the armed forces be on continuous active duty. Congress elected to create two components of the armed forces in the Department of the Navy comprised of recent retirees, whom it continues to pay, in exchange for the potential to be recalled as our national security demands. These members of the Fleet Reserve and Fleet Marine Reserve can constitutionally be considered part of the land and naval forces, and Congress has determined that they need to be subject to the UCMJ. To this determination we defer. *See Solorio*, 483 U.S. at 447 ("[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." (alteration in original) (internal quotation marks omitted) (citation omitted)).

Appellant asks us to adopt a narrow construction of Congress's express authority "[t]o make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, by excluding retirees from that power, but to do so would run counter to the Supreme Court's broad deference towards Congress in enacting federal criminal statutes pursuant to Congress's regulatory powers. Despite there being no express federal civilian police power in the Constitu-

tion, the Supreme Court has held that "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin." *Brooks v. United States*, 267 U.S. 432, 436 (1925). The Supreme Court has repeatedly endorsed Congress's decision to subject Americans to new federal crimes over objections that Congress has no such authority. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (upholding Congress's decision to criminalize the production and use of homegrown marijuana even if state law allowed for its growth and use); *Perez v. United States*, 402 U.S. 146, 156–57 (1971) (upholding Congress's decision to criminalize purely intrastate loan sharking). The "make Rules" clause has long been interpreted as providing Congress with the power to regulate the trial and punishment of members of the land and naval forces. *Dynes v. Hoover*, 61 U.S. 65, 71 (1857). Given Congress's broad authority to subject civilians to a federal criminal code based solely on its regulatory authority, we see no reason to narrowly construe Congress's express power to "make Rules" for the armed forces.

### IV. Equal Protection Challenge to Jurisdiction

Having established that Congress can subject retirees to jurisdiction under the UCMJ, we now consider Appellant's other assigned issue—whether it violates the equal protection component of the Fifth Amendment to subject members of the Fleet Reserve, but not retired reservists, to military jurisdiction.

### A. Standard of Review

"The constitutionality of a statute is a question of law; therefore, the standard of review is *de novo*." *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000).

### B. Law

The federal government is prohibited from violating a person's due process rights by denying him the equal protection of the laws. *Bolling v. Sharpe,* 347 U.S. 497 (1954). The "core concern" of equal protection is to act "as a shield against arbitrary classifications." *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 598 (2008). That is, the Government

must treat "similar persons in a similar manner." *United States v. Gray*, 51 M.J. 1, 22 (C.A.A.F. 1999) (internal quotation marks omitted) (citation omitted).

The initial question then, is whether the groups are similarly situated, that is, are they "in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992). As discussed below, Fleet Reservists and Retired Reservists are, in key aspects, not similarly situated. They serve a different purpose in our national defense scheme and have different benefits and obligations. They are, therefore, not similarly situated.[2]

## C. Discussion

"[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress, and with the President." *Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) (internal quotation marks omitted) (citing and quoting *Toth*, 350 U.S. at 17). To that end, Congress created the Fleet Reserve to provide a ready supply of highly trained naval manpower. Members of the Fleet Reserve have served as active-duty enlisted members of the Navy for between twenty and thirty years. 10 U.S.C. § 6330(b) (2012). As members of the Fleet Reserve, they receive retainer pay, based on that experience. 10 U.S.C. §§ 6330(c)(1), 6332. They are required to "[m]aintain readiness for active service in event of war or national emergency," MILPERSMAN Article 1830-040, CH-38, at 12, and may be recalled for training "[i]n time of peace." 10 U.S.C. § 8385(b). In fact, they are subject to recall at any time. 10 U.S.C. § 688(a).

---

[2] Even if they were similarly situated, we would employ rational basis review of their distinct treatment, and our analysis would be the same. We reject Appellant's contention that the Sixth Amendment right to a jury trial is implicated and so we should apply strict scrutiny. As we explained in Section III, members of the Fleet Reserve and regular retirees are both "part 'of the land and naval Forces'" and so neither have a Sixth Amendment right to a jury trial. Therefore, no fundamental right is implicated by their disparate treatment.

Retired reservists, by contrast, usually served only a few years on continuous active duty and then served part-time, for a total of at least twenty years. Once retired, they need not remain in the military, (although most do), and receive no pay until they reach statutory eligibility at age sixty. *See*, *e.g.*, Dep't of Defense, Reg. 7000-14R, Financial Management vol. 7B, ch. 6, para. 060401 (2020) ("Retired pay benefits authorized for non-regular members of the uniformed services in 10 U.S.C., Chapter 1223 are viewed as a pension and entitlement to retired pay under 10 U.S.C. § 12731 is not dependent on the continuation of military status."). They are not required to maintain any level of readiness and can be recalled only in the event of a declaration of war or national emergency by Congress. 10 U.S.C. § 12301(a) (2018). Even then, they only may be recalled once other tiers of available manpower have been exhausted. *Id.*

Appellant glosses over these distinctions, characterizing the pay differences as receiving "retired pay at some point in their retired years." (internal quotation marks omitted) (citation omitted). This, of course, ignores the critical distinctions: *when* they are paid, *why* they are paid, and *how much* they are paid.

Appellant also minimizes the recall distinctions by claiming the two groups are "similarly subject to involuntary recall." But of course, there are important distinctions as to both *when* they can be recalled and *why* they can be recalled. Members of the Fleet Reserve can be recalled during a war or national emergency declared by Congress; a national emergency declared by the President; or for training during peacetime. 10 U.S.C. § 8385(a)–(b). Retired reservists on the other hand, may only be recalled for the duration of a war or national emergency declared by Congress (or six months thereafter), and only after a determination that there are not enough qualified active reserves or national guardsmen to fill the need. 10 U.S.C. § 12301(a).

Appellant notes that the Government has not provided recent examples of *involuntary* recall of retirees. This may in part be due to sufficient numbers of retirees who have volunteered for recall, and because recent threats have not required that level of manpower. For that we may be grateful. But Congress has the duty to ensure the military is ready for

*future* threats and needs. That the use of the authority has not been necessary in the recent past hardly means that it is *unconstitutional* to be prepared in the event it is necessary in the future. Appellant was not required to enter the Fleet Reserve and accept retainer pay. But once he did, he made himself available to be recalled, and continued to be subject to the UCMJ.

In order to maintain our national security, Congress has created multiple mechanisms through which interested individuals may volunteer to serve in the armed forces. These mechanisms have varying rights and obligations. Congress has determined that having a class of retired reservists is beneficial, and their utility does not require a concomitant need for them to remain subject to the UCMJ while retired. True, all who have retired from the armed forces in any capacity remain subject to some level of recall—and this only makes sense. All else being equal, those who have trained and extensively served are more valuable in times of war than those who have not served or have served far less time. But members of the Fleet Reserve, being within ten years of full-time, active-duty service, are arguably much more useful in an emergency. They are more familiar with the current systems and can be brought up to speed much more quickly. To facilitate this, Congress pays them to, among other things, maintain readiness, which includes being subject to the UCMJ.

Congress does not violate equal protection by having different benefits and obligations for these two groups. Fleet Reservists volunteered to enter the Fleet Reserve and accepted current pay in exchange for maintaining readiness, being subject to recall, and being subject to the UCMJ. Retired reservists will only receive a reserve pension once they reach age sixty and can only be recalled once other sources of manpower have been exhausted. These two groups are not similarly situated, and so it does not violate equal protection to subject one and not the other to the UCMJ.

Court-martial jurisdiction over members of the Fleet Reserve does not violate the Constitution, nor does subjecting members of the Fleet Reserve and not retired reservists to

UCMJ jurisdiction violate equal protection. Therefore, Appellant, a member of the "land and naval Forces," was properly subject to jurisdiction under Article 2(a)(6), UCMJ.

## V. Judgment

The judgment of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

Judge MAGGS, with whom Judge Hardy and Senior Judge Crawford join, concurring.

The specified issue on which the parties have submitted supplemental briefs is "whether fleet reservists have a sufficient current connection to the military for Congress to subject them to constant [Uniform Code of Military Justice (UCMJ)] jurisdiction." This issue is not new. Appellant/Cross-Appellee (Appellant) acknowledges that our decision in *United States v. Overton*, 24 M.J. 309, 311 (C.M.A. 1987), has already answered the question in the affirmative, holding that Congress constitutionally may subject members of the Fleet Reserve and Fleet Marine Corps Reserve to trial by court-martial. The *Overton* decision is consistent with the longstanding view that retirees are in the armed forces. *See, e.g.*, *United States v. Tyler*, 105 U.S. 244, 246 (1882) ("We are of the opinion that retired officers are in the military service of the government . . . ."); *United States v. Hooper,* 9 C.M.A. 637, 643, 26 C.M.R. 417, 422 (1958) ("[R]etired personnel are a part of the land or naval forces."); William Winthrop, *Military Law and Precedents* 87 n.27 (2d ed., Government Printing Office 1920) (1895) ("That retired officers are a part of the army and so triable by court-martial [is] a fact indeed never admitted of question.").

Appellant nevertheless requests that we overrule *Overton* and reach a different conclusion. I agree with the reasons that the Court gives for rejecting Appellant's request, and I join the Court's opinion in full. I write separately only to address one aspect of Appellant's argument in more detail. In his briefs, as I describe below, Appellant makes some effort to demonstrate that this Court's decision in *Overton* was incorrect based on the original meaning of U.S. Const. art. I, § 8, cl. 14, and the Grand Jury Clause of the Fifth Amendment of the United States Constitution.

I commend Appellant for briefing this Court on historical sources pertinent to our interpretation of these provisions. A party urging a court to overturn its precedent on a constitutional issue at a minimum should show that the precedent is inconsistent with the original meaning of the Constitution. *Compare Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019) (declining to overrule precedents establishing the Dual

Sovereignty Doctrine after finding these precedents to be consistent with the Double Jeopardy Clause "[a]s originally understood"), *with Alleyne v. United States*, 570 U.S. 99, 103 (2013) (overruling *Harris v. United States*, 536 U.S. 545 (2002), for being "inconsistent with . . . the original meaning of the Sixth Amendment"). In this case, however, I ultimately do not find Appellant's originalist arguments persuasive.

**I. Appellant's Argument Under U.S. Const. art. I, § 8, cl. 14**

U.S. Const. art. I, § 8, cl. 14 empowers Congress "[t]o make Rules for the Government and Regulation of the land and naval Forces." Appellant argues that Congress cannot use this power to enact a law that subjects him to trial by court-martial because he was no longer part of the " 'land and naval [F]orces' " at the time of his offenses or his court-martial. Appellant acknowledges that, as a member of the Fleet Reserve, he continues to receive pay, he is subject to recall, and he is still enlisted. But Appellant asserts that these three facts are insufficient to make him part of the land and naval forces. On the contrary, Appellant asserts that he "has no regular military duties or authority" or, phrased another way, he has no "*actual* duties and responsibilities." And "because [he] has no ongoing military responsibilities," Appellant contends, "he cannot be regarded as part of the 'land and naval [F]orces' " within the meaning of U.S. Const. art. I, § 8, cl.14.

Appellant's argument appears to rest on two syllogisms. The major premise of the first syllogism is that a person is in the "land and naval Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14, only if the person has ongoing military duties or authority. The minor premise of the first syllogism is that Appellant does not have ongoing military duties or authority as a member of the Fleet Reserve. The conclusion of the first syllogism is that Appellant therefore is not in the "land or naval Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14.

The major premise of Appellant's second syllogism is that Congress may not subject to trial by court-martial a person who is not in the "land and naval Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14. The minor premise of the second syllogism (which would come from the conclusion of the first syllogism) is that Appellant is not in the "land and naval

Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14. The conclusion of the second syllogism is that Congress therefore may not subject Appellant to trial by court-martial.

I agree with part of this reasoning. The major premise of the second syllogism is settled. In *United States ex rel. Toth v. Quarles*, the Supreme Court held that "given its natural meaning, the power granted Congress 'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces." 350 U.S. 11, 15 (1955) (quoting U.S. Const. art. I, § 8, cl. 14). And if the minor premise of the second syllogism were true, then I would agree that the conclusion of the second syllogism would also be true.

But I am not convinced that the major premise of the first syllogism—that a person is in the "land or naval Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14, only if the person has ongoing military duties and authority—is true. As Appellant acknowledges, this Court held in *Overton* that retirees in the Fleet Reserve are part of the land and naval forces, and thus subject to trial by court-martial, based on their receipt of pay and the possibility of their recall to active duty. The Court in *Overton* did not identify ongoing military duties and authority as a requirement for being in the land and naval forces.

Appellant, however, argues that *Overton*'s reasoning is incorrect and should be overruled on two grounds. One ground is that newer understandings of the purpose of retired pay and recent experience showing the unlikelihood of his recall to active service have undermined *Overton*'s reasoning. The other ground is that *Overton*'s interpretation is contrary to the original meaning of U.S. Const. art. I, § 8, cl. 14. The Court amply addresses and correctly rejects Appellant's first argument. But I believe that Appellant's originalist argument merits a closer inspection.

To prove his assertion that U.S. Const. art. I, § 8, cl. 14, empowers Congress to regulate persons who do not have ongoing military duties and authority, Appellant draws on evidence from the records of the Continental Congress from the 1780s. I agree with Appellant that the Continental Congress's

practice under the Articles of Confederation is relevant in determining the original meaning of U.S. Const. art. I, § 8, cl. 14. The constitutional clause was copied from the Articles of Confederation, which gave Congress the power of "making rules for the government and regulation of the said land and naval forces, and directing their operations." Articles of Confederation of 1781, art. IX, para. 4; *see also* 2 *The Records of the Federal Convention of 1787*, at 330 (Max Farrand ed., 1911) (James Madison's Notes, Aug. 18, 1787) (recognizing the clause was borrowed "from the existing Articles of the Confederation") [hereinafter *Farrand's Records*]; 3 Joseph L. Story, *Commentaries on the Constitution* § 1192 (1833) ("It was without question borrowed from a corresponding clause in the articles of confederation.").[1] Accordingly, the Framers of the Constitution probably intended, those who ratified the Constitution probably understood, and the public probably construed "land and naval Forces" to have the same meaning in the Constitution as in the Articles of Confederation. *See Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 231 n.3 (1998) (reasoning that language in the Constitution has the same meaning as almost identical language in the Articles of Confederation); Felix Frankfurter, *Some Reflections on Reading Statutes,* 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source . . . it brings the old soil with it.").

The question is whether the evidence that Appellant cites is on point and persuasive. Appellant shows that in 1780, the Continental Congress offered "officers who shall continue in the service to the end of the war" half-pay for life after their "reduction." 18 *Journals of the Continental Congress 1774-1789*, at 958–60 (Worthington Chauncey Ford et al. eds., reprints published from 1904–37 by the Government Printing Office) (Oct. 21, 1789) [hereinafter *Journals*]. Appellant further shows that in 1781, the Continental Congress passed a similar law for "hospital department" officers. 19 *Journals* at

---

[1] The most significant difference between the clauses in the Constitution and the Articles of Confederation is that the Constitution assigns control over the operations of the armed forces to the President as the commander-in-chief, rather than to Congress. *See* U.S. Const. art. II, § 2, cl. 1. That difference is not relevant here.

68–70 (Jan. 13, 1781). Appellant contends that these examples show that the Continental Congress provided "for post-duty compensation *without* military status."

These examples, in my view, do not establish the truth of the major premise of the first syllogism on which Appellant's argument rests. The examples do not show that a person is in the "land and naval Forces" within the meaning of U.S. Const. art. I, § 8, cl. 14, only if the person has ongoing military duties or authority. Instead, the examples show merely that a person could receive pay for past military service without being in the land or naval forces. That point is not contested in this case and is insufficient to show that *Overton* was wrongly decided.

In my view, however, other acts of the Continental Congress are relevant because they provide an unmistakable counterexample that contradicts, and thus disproves, the major premise of Appellant's first syllogism. The counterexample concerns furloughed soldiers. The Articles of War originally empowered unit commanders to grant furloughs. *See* Articles of War of 1775 art. LVI, *reprinted* in 2 *Journals* at 120 (June 30, 1775). Congress, however, later withheld this power to higher authorities, and at the same time standardized the documentation provided to furloughed and discharged soldiers. 20 *Journals* at 656–57 (June 16, 1781). The furlough document specified that the bearer was permitted to be absent from his regiment, while the discharge document said that the bearer was discharged from the regiment. *Id.* These documents taken together make clear that furloughed soldiers were still in the Army because they were not discharged and that they did not have ongoing duties because they were authorized to be absent.

Perhaps the most telling instance of furloughs took place at the end of the Revolutionary War. In May 1783, with the British Army essentially defeated and a permanent peace treaty expected imminently, Congress had to decide what to do with the soldiers remaining in the victorious Continental Army: Should they be discharged, furloughed, or retained? The *Journals* describe the debate as follows:

> The Report from Mr Hamilton, Mr Gorham and
> Mr Peters, in favor of discharging the soldiers
> enlisted for the war, was supported on the ground

> that it was called for by Economy and justified by the degree of certainty that the war would not be renewed. Those who voted for furloughing the soldiers wished to avoid expence, and at the same time to be not wholly unprepared for the contingent failure of a definitive treaty of peace. The view of the subject taken by those who were opposed both to discharging and furloughing, were explained in a motion by Mr. Mercer seconded by Mr. Izard to assign as reasons, first that Sr Guy Carleton [the commander-in-chief of all British forces in North America] had not given satisfactory reasons for continuing at N. York, second, that he had broken the Articles of the provisional Treaty.

25 *Journals* at 966–67 (May 23, 1783). In the end, Congress decided to furlough a large contingent of soldiers indefinitely. *Id.* at 967. As the passage above shows, these soldiers remained in the Army and were subject to recall at any time, but they had no ongoing duties. These soldiers were not discharged until Congress approved a proclamation after the signing of the Treaty of Paris, terminating their service effective November 3, 1783. *Id.* at 703 (Oct. 18, 1783). "[S]uch part of the federal armies as . . . were furloughed," the proclamation stated, "shall, from and after the third day of November next, be absolutely discharged . . . from said service." *Id.*

The May 1783 furlough, and additional furloughs that soon followed, provoked outrage among many of the furloughed soldiers, some of whom were owed considerable unpaid wages. One historian sympathized with their ire, noting that "[t]here was neither provision for a settlement of accounts nor even a word of appreciation for the soldiers." Kenneth R. Bowling, *New Light on the Philadelphia Mutiny of 1783: Federal-State Confrontation at the Close of the War for Independence*, 101 Penn. Mag. of Hist. & Biog. 419, 423 (1977). In June 1783, hundreds of these furloughed soldiers took part in a mutinous demonstration targeting Congress in Philadelphia. *See* Mary A. Y. Gallagher, *Reinterpreting the "Very Trifling Mutiny" at Philadelphia in June 1783*, 119 Penn. Mag. of Hist. & Biog. 3, 3–4 (1995).

Underscoring the view that these furloughed soldiers were still in the Army, despite having no current or ongoing duties, some of the suspected participants were charged with mutiny

in "breach of the third article of the second section of the rules and articles of war." 25 *Journals* at 566 (Sept. 13, 1783). Mutiny was an offense only an "officer or soldier" could commit. Articles of War of Sept. 20, 1776, § II, art. 3, *reprinted in* 5 *Journals* at 789 (Sept. 20, 1776). The court-martial found several of the accused guilty, and adjudged serious punishment. *See* 25 *Journals* at 566 (Oct. 13, 1783). "Sentenced to whippings were gunner Lilly, drummer Horn, and privates Thomas Flowers and William Carman. Sentenced to death by hanging were the two sergeants who had led the demonstration, John Morrison and Christian Nagle." Bowling, 101 Penn. Mag. of Hist. & Biog. at 445. Mercifully, in exercise of its "special grace," Congress later pardoned the offenders, noting that no lives were lost, no property was destroyed, and those convicted "appear not to have been principals in the said mutiny." 25 *Journals* at 566 (Sept. 13, 1783). In granting the pardons, however, Congress did not suggest that the courts-martial lacked jurisdiction because the furloughed status of the soldiers meant that they were out of the Army.[2]

In conclusion, because Appellant is asking us to overrule *Overton*, he should at a minimum demonstrate that *Overton* was incorrect as an original matter. His originalist argument rests on a claim that the "land and naval Forces" did not include persons who had no ongoing duties. Assuming that the

---

[2] Later evidence provides additional support. In 1787, Congress asked the Secretary of War Henry Knox whether a discharged former soldier, John Sullivan, could be tried by court-martial *after his discharge* for his participation in the mutiny "while he with the greater part of the Army were furloughed as a preparatory step to their being discharged." 33 *Journals* at 666–67 (Oct. 12, 1787). It was "a questionable point, whether he or any other person could be legally tried by a court martial for crimes committed during the existence of the Army." *Id.* at 667. Knox reported that "were such an attempt to be made at this late period it might be a considered an unusual stretch of power." *Id.* In addition to the potential jurisdictional problem, Knox also noted that procuring evidence would be "utterly impracticable." *Id.* Knox's doubt that a discharged former soldier could be tried by court-martial for acts committed while he was still in the Army is consistent with what the Supreme Court would later hold in *Toth*, and stands in contrast to the evident understanding that a court-martial could try soldiers who had been furloughed but not discharged.

term "land and naval Forces" had the same meaning in the Articles of Confederation as in U.S. Const. art. I, § 8, cl. 14, Appellant has failed to convince me that his claim is correct because furloughed soldiers provide a clear counterexample. Furloughed soldiers had no ongoing duties, but they were in the Army, and they were subject to court-martial for offenses committed while furloughed.

I should add that Appellant has not cited evidence from other sources that courts typically consult to discern the original meaning of the Constitution. In my review of several of these other sources, I have uncovered nothing that suggests that having ongoing duties and authority was a requirement of membership in the armed forces. Dictionaries from the founding era do not define the compounds "land forces" and "naval forces," and the definitions of similar words like "Army" and "Navy" provide no guidance on whether their members necessarily had ongoing military duties.[3] The records of the Constitutional Convention of 1787 show that the Framers principally discussed the provision that became U.S. Const. art. I, § 8, cl. 14, on August 18, 1787. *See* 2 *Farrand's Records* at 330–31. Their discussion of the topic focused mostly on whether to limit the size of the land and naval forces during peacetime and did not address the specific issue in this case. *Id.*

In *The Federalist Papers*, attention to the land and naval forces mostly addressed the President's role as the commander-in-chief, the funding of the military, and the need for some permanent forces despite valid concerns about standing armies. *See, e.g.*, *The Federalist* No. 41, at 119 (James Madison) (in *The Federalist Papers*, Roy P. Fairfield ed., Anchor Books 2d ed. 1966) (1788) (noting that the Constitution gives Congress an "INDEFINITE POWER of raising TROOPS, as well as providing fleets; and of maintaining both in PEACE, as well as in war"); *The Federalist* No. 23, at 59 (Alexander

---

[3] I consulted nine English language dictionaries and four legal dictionaries from the founding era that the Supreme Court often considers in attempting to discern the original meaning of the Constitution. *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 382–92 (2014) (listing these dictionaries and providing links for finding them online).

Hamilton) (in *The Federalist Papers*, Roy P. Fairfield ed., Anchor Books 2d ed. 1966) (1787) (noting that there is no "limitation of that authority which is to provide for the defence and protection of the community in any matter essential to its efficacy—that is, in any matter essential to the *formation*, *direction*, or *support* of the NATIONAL FORCES"). And while early state constitutions and the state ratification debates have some relevance to Appellant's second argument as discussed below, I found nothing that specifically addressed the issue of whether the "land and naval Forces" include only persons with ongoing duties.[4] These other sources, in short, do not contradict the evidence and the conclusion obtained from the records of the Continental Congress concerning the status of furloughed soldiers.

## II. Appellant's Argument under the Grand Jury Clause of the Fifth Amendment

Appellant also presents arguments addressing the Grand Jury Clause of the Fifth Amendment. This clause provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. Const. amend. V. Appellant contends that this clause bars his trial by court-martial. He asserts: "[E]ven if [he] remains a member of the 'land and naval forces' for purposes of the Make Rules Clause, the dispute must still 'arise[] in the land or naval forces' for purposes of the Fifth Amendment's Grand Jury Indictment Clause . . . for the military to exercise jurisdiction." (Third alteration in original.) Appellant asserts that his case did not arise in the land or naval forces because the conduct for which he was found guilty took place after he retired from active duty, did not constitute a "military-specific" crime, and bore no connection to

---

[4] To the extent English practice might be relevant, Blackstone said that the "military state includes the whole of the soldiery; or, such persons as are peculiarly appointed among the rest of the people, for the safeguard and defence of the realm," a definition that does not contain an active-duty requirement. 1 William Blackstone, *Commentaries on the Laws of England* 395 (1st ed. 1765).

either his prior active-duty service or his future amenability to recall.

As the Court correctly explains, the Supreme Court already has rejected the view that court-martial jurisdiction depends on whether the charged offense has a "service connection." *United States v. Begani*, __ M.J. __ (6) (C.A.A.F. 2021). I therefore see no need to address further Appellant's contentions that the alleged offense is not "military-specific" and is not related to Appellant's prior active service or possible future active service. Instead, I will discuss only his argument that he has a right to a grand jury because he did not commit his offenses while on active duty.

The text of the Grand Jury Clause makes Appellant's argument implausible. The drafters of the Fifth Amendment distinguished between armed forces that are in actual or active service and armed forces that are not. They created a *general* exception to the requirement of a grand jury indictment for members of the "land and naval forces" but a *limited* exception for members of the "Militia" that applies only when members of the "Militia" are "in actual service." U.S. Const. amend. V. This distinction leads to an inference that the exception for the "land and naval forces" applies without regard to whether a member of the land and naval forces was in actual service at the time of the offense. As the Supreme Court has put it: "All persons in the military or naval service of the United States are subject to the military law, — the members of the regular army and navy, *at all times*; the militia, so long as they are in such [actual] service." *Johnson v. Sayre*, 158 U.S. 109, 114 (1895) (emphasis added). The term "actual service" meant that persons have some ongoing duties. *See* Story, *supra,* at § 1208. ("To bring the militia within the meaning of being in actual service, there must be an obedience to the call, and some acts of organization, mustering, rendezvous, or marching, done in obedience to the call, in the public service."). Accordingly, the text of the Grand Jury Clause indicates that members of the "land and naval forces" can be tried without a grand jury indictment despite having no ongoing duties, even though members of the "Militia" cannot.

History supports this interpretation. At the time of the framing of the Constitution, the question of who was subject to trial by court-martial was important. Three state

constitutions expressly limited the exercise of court-martial jurisdiction over militiamen to those in actual service without requiring the same for members of regular forces. The Massachusetts Constitution provided: "No person can in any case be subject to law-martial, or to any penalties or pains, by virtue of that law, except those employed in the army or navy, and except the militia in actual service, but by authority of the legislature." Mass. Const. of June 15, 1780, pt. 1, art. XXVIII, *reprinted in* 3 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America* 1888, 1893 (Francis Newtown Thorpe ed., 1909) [hereinafter *Federal and State Constitutions*]. The New Hampshire and Maryland Constitutions had similar provisions.[5]

When the ratifying conventions in Massachusetts and New Hampshire voted to approve the federal Constitution, they each requested that a similar provision be included in a federal Bill of Rights. Both states proposed the same language: "That no person shall be tried for any crime by which he may incur an infamous punishment, or loss of life, until he be first indicted by a grand jury, except in such cases as may arise in the government and regulation of the land and naval forces." 1 *The Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in*

---

[5] The New Hampshire Constitution provided: "No person can in any case be subjected to law martial, or to any pains, or penalties, by virtue of that law, except those employed in the army or navy, and except the militia in actual service, but by authority of the legislature." N.H. Const. of June 2, 1784, art. XXXIV, *reprinted in* 4 *Federal and State Constitutions*, at 2453, 2457. It also provided: "Nor shall the legislature make any law that shall subject any person to a capital punishment, excepting for the government of the army and navy, and the militia in actual service, without trial by jury." N.H. Const. of June 2, 1784, art. XVI, *reprinted in* 4 *Federal and State Constitutions*, at 2455. The Maryland Declaration of Rights similarly provided: "That no person, except regular soldiers, mariners, and marines in the service of this State, or militia when in actual service, ought in any case to be subject to or punishable by martial law." Md. Declaration of Rights of Nov. 11, 1776, art. XXIX, *reprinted in* 3 *Federal and State Constitutions*, at 1686, 1689.

*1787* at 323 (J. Elliot ed., 1827–1830) (Massachusetts); *id.* at 326 (New Hampshire).

The Fifth Amendment incorporates many of these same words. In drafting the Fifth Amendment, Congress pointedly and similarly decided not to qualify the exception for land and naval forces with an "actual service" limitation. Instead, Congress placed that restriction only on the government and regulation of the "Militia." Given the importance of the issue, this distinction must have been intentional and would have been seen as such. Against this background, and consistent with the syntax of the Fifth Amendment, I conclude that those who framed the Fifth Amendment must have intended, those who voted to ratify must have understood, and members of the public would have construed the "actual service" limitation to apply only to members of the "Militia" and not to members of federal land and naval forces.

### III. Conclusion

As explained above, our decision in *Overton* has already answered the specified question. We should not overturn *Overton* in this case because Appellant has not shown that it conflicts with the original meaning of the Constitution.[6] I concur with the Court's opinion.

---

[6] The United States District Court for the District of Columbia recently reached a different conclusion in *Larrabee v. Braithwaite*, 502 F. Supp. 3d 322, 324 (D.D.C. 2020). The thoughtful opinion of the learned district court, in my view, also does not demonstrate that our decision in *Overton* was incorrect as an original matter.